UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

JERRY McLEOD,                          *
                                       *
                    Plaintiff,         *
                                       *
        v.                             *        Civil Action No. 7:20-cv-244
                                       *
MIKE DEWEY and  MIKE BASS,             *
                                       *
                    Defendants.        *


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

COME NOW Mike Dewey and Mike Bass, Defendants in the above-styled case,

and file this their Memorandum of Law in Support of Motion for Summary Judgment,

showing this Court, as follows:

### Introduction

This case was initiated by Plaintiff Jerry McLeod ("McLeod") on December 3,

2020. McLeod's initial complaint named over a dozen defendants and included

countless claims and grievances. McLeod was then granted *in forma pauperis* ("IFP")

status, and was ordered to recast his complaint to include only valid claims which have

not been ruled on and which were not barred by the statute of limitation. *See Dkt. No.*

*20.* McLeod did not heed this Court's directive. The recast Complaint was 142 pages

and included 345 paragraphs. This Court then ruled that the recast Complaint was a

shotgun pleading, and ordered McLeod to file an amended complaint. McLeod filed his

Amended Complaint on October 15, 2021. *Dkt. No 26.* On October 12, 2022, the Court

1

issued an Order on its frivolity review of the Amended Complaint, as required by the IFP statute. *See Dkt. No. 27*. In the Order, the Court stated:

> Plaintiff's Amended Complaint outlines only one potentially viable claim. Plaintiff alleges that on the afternoon of July 20, 2020, Brooks County Sheriff's Officer Mike Bass arrested Plaintiff absent probable cause. (Doc. 26, ¶ 28). When Plaintiff inquired about the reason for his arrest, Officer Bass retorted, "[B]ecause [M]ike Dewey told me to do it." (Id.). Once at the jail, Magistrate Judge David Crosby declined to issue a warrant for Plaintiff's arrest and declared that he would issue no further warrants for Plaintiff unless Plaintiff killed someone. (Id.). The Magistrate Judge then ordered Plaintiff returned to his home. (Id.). To the extent that Plaintiff intends to assert a claim for false arrest against Sheriff Mike Dewey and Officer Mike Bass, the Court will permit that claim to proceed for further factual development. The Court DISMISSES all other claims against all other Defendants.

*Dkt. No. 27*, p. 3-4. As such, there remains only a single false arrest claim against Deputy Mike Bass ("Deputy Bass") and Sheriff Mike Dewey ("Sheriff Dewey") in this case.

## Statement of Facts

### I.    The sworn testimony of Defendants and witnesses.

At all times relevant to the events at issue in this case, Deputy Bass was a deputy with the Brooks County Sheriff's Department ("BCSD") and Sheriff Dewey was the Sheriff of the BCSD. *Dkt. Nos. 55, 58*. On July 25, 2019, Deputy Bass responded to a complaint by a county road department worker, Randy Jones, that McLeod was yelling and cursing at him. *Dkt. No. 55*. Deputy Bass was familiar with McLeod based on past complaints against him and prior issues concerning McLeod possessing animals, including allegations and charges against McLeod related to cruelty to animals. *Id*. When Deputy Bass arrived on scene, he made contact with the

complainant, Jones, who informed Deputy Bass that McLeod had been yelling and cursing at him. *Id.* Jones told Deputy Bass that this created a concern for his safety. *Id.*

Deputy Bass then proceeded to McLeod's property in an effort to make contact with him. *Id.* At that point, Deputy Bass observed two dogs chained up on McLeod's property. *Id.* Deputy Bass called for McLeod but was unable to make contact with him while at the property. *Id.* Deputy Bass then left the property. *Id.*

Later that day, Deputy Bass received another complaint that McLeod was again yelling at Jones while Jones was working on Beasley Road. *Id.* At that point, and as part of Deputy Bass's investigation into this latest complaint, Deputy Bass spoke to Captain Owen of the BCSD about McLeod. *Dkt. Nos.55, 56.* During that conversation, Deputy Bass was informed by Captain Owen that there was a Bond Order in place against McLeod related to cruelty to animal charges (Warrant Nos.: CR-17-158-207, CR-17-211). *Dkt. Nos.55, 56; see also Bond Order, Ex. A.* As a condition of the Bond Order, which was entered on March 21, 2017, McLeod agreed that he would not have any contact with animals, nor own, possess, or otherwise care for animals. *Id.* The Bond Order stipulated that a violation of its terms may result in McLeod's arrest and detention. *Id.* Deputy Bass was aware of this Bond Order and its conditions prior to returning to the area of the incident around McLeod's property. *Dkt. No. 55.*

When Deputy Bass returned to the scene, he observed McLeod standing along the road a few feet from the county road department workers. *Dkt. No. 55.* McLeod was

taking pictures and yelling at the county workers as they were working. *Id*. This interaction witnessed by Deputy Bass was consistent with the report by Jones regarding McLeod's aggressive and threatening behavior. *Id*. Deputy Bass personally witnessed McLeod behaving in an aggressive and tumultuous manner toward the county road department workers, including Jones. *Id*. Deputy Bass believes that Jones had a reasonable fear for his physical safety based on McLeod's language, actions, and demeanor, which appeared to be intended to intimidate the county road department workers into abandoning the public works project. *Id*.

Deputy Bass then advised McLeod that he was under arrest for violating his bond condition for having dogs on his property. *Dkt. No. 55.* Deputy Bass did not charge McLeod with Disorderly Conduct in violation of O.C.G.A. § 16-11-39, but Deputy Bass believes that McLeod's threatening and aggressive conduct toward the county workers provided probable cause for an arrest on that basis, as well. *Id*. At the jail, as part of the booking process, Deputy Bass filled out the jail intake sheet[1] and reviewed a written copy of the March 21, 2017 Bond Order. *Id*.

During the booking process, Deputy Bass spoke with Brooks County Magistrate Judge David Crosby ("Judge Crosby") about the charge against McLeod, which was based on a violation of the conditions of his Bond Order. *Dkt. Nos. 55, 57.* During the conversation, Judge Crosby explained to Deputy Bass that he was unsure of the status of the Bond Order and whether it had been modified, extinguished, or superseded in

---

[1]*Jail Intake Sheet, Ex. B.*

4

some way because Judge Crosby understood that McLeod was litigious and contested past charges against him. *Dkt. No. 57.* Judge Crosby did not want to sign an arrest warrant or have McLeod detained if the Bond Order was no longer in place. *Id.* Because Crosby was unsure of the status of the Bond Order, Crosby instructed Deputy Bass not to complete the booking process and told him to return McLeod home. *Id.* McLeod was returned back home. *Dkt. No. 55.* McLeod estimates that the entire incident (from arrest through returning back home) lasted about one hour. *Deposition of McLeod, at 68:2-6.*

Shortly after the day of the incident, Judge Crosby confirmed that on July 25, 2019, the Bond Order was, in fact, valid and in place and had not been modified, extinguished, superseded, voided, or altered in any way. *Dkt. No. 57.* Judge Crosby's testimony is that, if he had known the correct status of the Bond Order on July 25, 2019, he would have executed an arrest warrant for McLeod for violating the terms of his bond conditions based on sworn testimony from Deputy Bass that McLeod was possessing dogs chained in his yard on the day of the incident. *Id.*

As to the claim against Sheriff Dewey, the evidence establishes that Sheriff Dewey never personally participated in or directed any action or conduct that led to McLeod being taken into custody by Deputy Bass on July 25, 2019. *Dkt. No. 58.* Sheriff Dewey did not have any role at all in the decision to charge, arrest, or detain McLeod on July 25, 2019. *Id.* Sheriff Dewey did not personally participate in, know about, or direct any action that led to McLeod being taken into custody on July 25, 2019,

5

including any action involving McLeod being charged with violating the conditions of his Bond Order. *Id.* Nor did Sheriff Dewey personally participate in, know about, or direct any action related to any decision made to not pursue the charges and to release McLeod. *Id.*

## II.    The testimony of McLeod

McLeod admits that he has been arrested "a bunch of times . . . [w]ith these dogs[,]" both before and after the date of the subject incident. *Deposition of McLeod, 14:9-13*.

> Q.    And do you recall the dates that you were arrested?
> A.    Well, I don't recall them all. I know they started back in 2016 and then they arrested me again in 2017 and February the 23rd, I believe, of March 1 of that date.
> Q.    In 2017?
> A.    Yeah. '18, '19, '20, '21. Whatever – Every year. Every time I file something, they arrest me.

*Id.* at 14:23-25, 15:1-4. McLeod has also filed numerous lawsuits: "I've filed a bunch of them, yeah." *Id.* at 23-28. McLeod believes that he has sued Sheriff Dewey at least three times. *Id.* at 28:20-21. McLeod always represents himself in his suits. *Id.* at 29:2-12.

McLeod testified that it "sounds right" that the allegations in this case relate to his arrest on July 25, 2019. *Id.* at 31:18-25, 32:1-3. McLeod agrees that he was taken into custody by Deputy Bass on the day he had the dispute with the road department. *Id.* at 52:5-11. McLeod testified that he owned a dog named Buddy on the date of the

incident[2] and, because he has had dogs "taken" on several occasions, he does not know exactly how many dogs he had at the time of the incident. *Id.* at 43:13-23. Buddy was not professionally trained and had no certifications. *Id.* at 56:1-8. Buddy was chained up on July 25, 2019 and, according to McLeod, "was always chained up[.]" *Id.* at 57:18-21. McLeod considered Buddy an assistance dog because he can bark when people approach his property because "they'd already stolen all my property and everything" and "you need some notice before somebody comes right to your door." *Id.* at 58:1-8. By barking, that gives McLeod "time to mount some defense." *Id.* at 58:12-15.

McLeod had never seen Deputy Bass before the incident on July 25, 2019 and had no connection to him at that time. *Id.* at 35:11-17. On this day, the county road department was intending to perform some work in front of McLeod's property that involved digging a ditch to address a pipe issue. *Id.* at 36:10-25, 37:1-10. According to McLeod, he told the county worker "to hell you are, you're not digging anything out." *Id.* at 36:34-35. When Deputy Bass responded to the scene, McLeod admits that there were two dogs chained on his property. *Id.* at 39:1-11. McLeod argues that "there's no law against chaining dogs up." *Id.* at 39: 10-11. According to McLeod, "[t]here was nothing wrong with the dogs" on his property that day. *Id.* at 41:25, 42:1.

McLeod admits that on July 25, 2019, there was a criminal bond in effect that prohibited McLeod from possessing any dogs:

Q.    Okay. But at the time, on July 25th, 2019 there was –- a bond order in place that prohibited you from having –-

---

[2]*Id.* at 34:2-13.

7

> A.    That's right. Said I couldn't own any dogs, yeah.
> Q.    Okay. All right.

*Id.* at 45:7-10. McLeod disagreed with the bond conditions because the conditions

restricted his ability to have animals:

> Well, they – See, they can't – The magistrate judge can't put these
> conditions on there. But they put some on there anyway. And I'm saying
> he has no authority over that and there's no ordinance requiring how
> many animals one can have.

*Id.* at 32:23-25, 33:1. According to McLeod, who freely admits he has dogs and cats, he

is "going to keep having animals." *Id.* at 33:6-13. When presented with the March 21,

2017 Bond Order, McLeod admits that it was executed by his attorney and a judge, but

claims that it previously had not been enforced.  *Id.* at 53:15.  McLeod understands

that if a person violates the condition of a bond order, they can be arrested for that

violation:

> Q.    I'm not asking you specifically. I'm asking you, if you violate a bond, it
>       can result in your arrest and detention, correct?
> A.    Well, technically, yes.

*Id.* at 59:25, 60:1-3.  But McLeod claims that he was free to violate the condition of his

bond order because "[t]he court had an opportunity to enforce it and they didn't enforce

it." *Id.* at 59:16-17.

## III.    McLeod's unanswered Requests for Admission ("RFAs") are deemed admitted.

On or about January 23, 2023, Defendants served the RFAs on McLeod.

*Defendants' Request for Admissions to Plaintiff, Ex.C.* McLeod failed to respond to the

RFAs. *Declaration of B. Watkins*, *Ex. D.*  The RFAs requested that McLeod admit the

8

following facts:

1.   Admit that on or about March 21, 2017, you were released from custody pursuant to the Blanket Bond Order attached hereto as Exhibit "A".

2.   Admit that as of July 25, 2019, there had been no resolution of the criminal charges reflected on Exhibit "A".

3.   Admit that on July 25, 2019, you were subject to the conditions set forth in the Blanket Bond Order attached hereto as Exhibit "A".

4.   Admit that on July 25, 2019, you owned, possessed, or were otherwise caring for one or more animals.

5.   Admit that on July 25, 2019, at least one dog was chained or tied up on your property.

6.   Admit that you were taken into custody by Mike Bass on July 25, 2019 for a violation of your bond conditions.

*Ex. A*. Again, McLeod has failed to provide any response to these RFAs, so they are deemed admitted.[3] Of course, the testimony of McLeod and others have established these same facts.

## Standard of Review

---

[3]As relevant here, "[a] party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to ... facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a). "The purpose of the rule is 'to expedite the trial and to relieve the parties of the cost of proving facts that will not be disputed at trial.' " *Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1264 (11th Cir. 2002) (*quoting* 8A Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice & Procedure § 2252 (2d ed. 1994)). "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter...." Fed. R. Civ. P. 36(a); *see also Perez*, 297 F.3d at 1264 ("If a party fails to respond within thirty days, then '[t]he matter is admitted.'" (alteration in original) (*quoting* Fed. R. Civ. P. 36(a))). "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b) (emphases added). *See Peters v. Elsheikh*, 1:20-cv-749-ECM at 2-3, 2022 WL 163622 (M.D. Ala. Jan. 18, 2022)(Unanswered RFAs served on the defendant were deemed admitted by operation of law after thirty days had passed with no response).

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. *Id.* at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in [her] pleadings. Rather, [her] responses . . . must set forth specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986), and will draw all justifiable inferences in the nonmovant's favor.

*Anderson*, 477 U.S. at 255.

**Argument and Citation to Authority**

I.  **McLeod's false arrest claim against Deputy Bass and Sheriff Dewey fails because probable cause (or at a minimum arguable probable cause) existed for the charged offense.**

An officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause to make the arrest. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). Probable cause is established where facts, "derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude ... that there was a substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (*quoting District of Columbia v. Wesby*, —— U.S. ——, 138 S.Ct. 577, 588, 199 L.Ed. 2d 453 (2018)).[4]

Even if probable cause did not exist for an arrest, qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not

---

[4]As the Eleventh Circuit explained in *Washington*, the probable cause standard applied in *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018) is incorrect. 25 F.4th at 900–02. The incorrect standard required "facts and circumstances" that "would cause a prudent person to believe" a crime was committed. *Id.* at 899. The correct standard, promulgated by the Supreme Court in *Wesby*, is "whether a reasonable officer could conclude ... that there was a substantial chance of criminal activity." 138 S. Ct. at 588.

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). For qualified immunity to apply, a government official must first establish that he was acting within his discretionary authority when the alleged wrongful acts occurred. *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016). Here, there can be no debate that Deputy Bass was exercising discretionary authority when he made the decision to arrest McLeod for violating the conditions of the Bond Order.

"Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the McLeod to establish that qualified immunity is inappropriate." *Id.* "First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right." *Id.* "Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct." *Id.* "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (*quoting Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)) (internal quotation marks omitted).

A plaintiff can demonstrate that a right was clearly established in three ways. First, "materially similar" case law may give an officer fair notice that his conduct would violate a constitutional right. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Second, the plaintiff can show the existence of a "broader, clearly

established principle [that] should control the novel facts [of his] situation." *Id.* In other words, even "[i]f there is no case law directly on point, general statements of the law contained within the Constitution, statute, or case law may sometimes provide 'fair warning' of unlawful conduct." *Id.* (quotation omitted and alteration adopted). Finally, in rare instances, an official may still have notice when his conduct "so obviously violates" a constitutional right. *Id.* Absent one of these standards being met, an officer is entitled to qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

To establish the defense of qualified immunity for a false arrest claim, "an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown*, 608 F.3d at 734 (internal citation omitted). An officer has arguable probable cause if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Wesby*, 138 S. Ct. at 593. An officer lacks arguable probable cause only if "the state of the law on the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington*, 25 F.4th at 903 (quotation omitted). Accordingly, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of McLeod's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest McLeod under the particular circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) (emphasis omitted).

In *Garcia v. Casey*, 75 F.4th 1176, 1187 (11th Cir. 2023), the Eleventh Circuit noted that the concept of "arguable probable cause" is "a useful shorthand to collapse these three inquiries into a single question in a wrongful arrest case." Accordingly, the relevant question is whether "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Id.* (*citing Wesby*, 138 S. Ct. at 593).

Under our precedents, McLeod "bears the burden of proving both that the defendant violated [his] constitutional right[s] and that 'the right was clearly established at the time of the violation.'" *Washington*, 25 F.4th at 898 *(quoting Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012)). In this action, McLeod's Fourth Amendment false arrest claim fails because he cannot meet his burden of proving that Deputy Bass or Sheriff Dewey violated his constitutional rights. Beyond that, McLeod's claim would fail even if he could establish a violation of his constitutional rights because Defendants are entitled to qualified immunity. McLeod cannot establish that the law was clearly established such that no reasonable officer would have interpreted the law as permitting McLeod's arrest under the established facts and circumstances.

In terms of probable cause for the arrest, the analysis is straightforward. On July 25, 2019, McLeod was subject to the conditions set forth in the Bond Order that prohibited McLeod from having any contact with animals, which included owning, possessing, or otherwise caring for animals. *Dkt. No.55.* The Bond Order stipulated that a violation of its terms may result in McLeod's arrest and detention. *Id.* It is

undisputed that on July 25, 2019, McLeod owned, possessed, or was otherwise caring for animals on his property, including the dogs that were chained on his property. Under these circumstances, probable cause certainly existed to charge McLeod with violating the conditions of his Bond Order by possessing animals in violation of the express terms of the Bond Order. *See Malone v. Williams*, Civil Action No. CV-208-15, 2009 WL 212149 (S.D. Ga. Jan. 29, 2009)(Officer was entitled to qualified immunity as he had arguable probable cause to arrest the plaintiff for violating a bond condition that prohibited contact with ex-girlfriend where evidence supported reasonable belief that bond condition had been violated); *Trent v. Huff*, 178 F.Supp.3d 565 (E.D. KY 2016)("by violating his bond conditions by failing his third drug test, the plaintiff created new probable cause for his re-arrest and detention"). At a minimum, arguable probable cause certainly existed for McLeod's arrest for admittedly violating the conditions of his Bond Order.

Under Georgia law, it is immaterial that a bond revocation hearing was not held prior to McLeod's arrest since at least arguable probable cause existed to believe McLeod had violated his bond conditions. In *Hood v. Carsten*, 267 Ga. 579, 580-582, 481 S.E.2d 525 (1997),[5] Hood was indicted on charges of aggravated assault and stalking. As a condition of bond, Hood was ordered to have no contact with the victim

---

[5]Federal courts in Georgia look "to the decisions of the Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court" to determine whether the state of the law at the time of the incident gave fair warning that [Defendants'] conduct was unlawful." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312,1325 (11th Cir. 2016). *See also Gains v. Wardynski*, 871 F.3d 1203, 1208-09 (11th Cir. 2017).

or her place of business. Less than three months after being released on bond, Hood telephoned the victim at her home, insisting that she meet with him. The victim informed the district attorney's office of the telephone call and expressed concern for her safety and that of her family. An assistant district attorney assigned to the case presented an *ex parte* motion to revoke bond to Judge Stark of the Gwinnett County Superior Court. Judge Stark signed the order revoking bond on March 11, 1996 and scheduled a hearing on the bond revocation for March 14, 1996. However, Hood moved to recuse Judge Stark and the bond revocation hearing never took place. Ultimately, the Georgia Supreme Court held that Hood was entitled to habeas relief because his bond was revoked without any hearing on the merits of the bond revocation and without any meaningful opportunity to be heard.

Importantly, the Georgia Supreme Court held that the State is not limited to moving for the revocation of bond *prior to* an arrest when a defendant released on bond commits a subsequent criminal violation. Indeed, the Georgia Supreme Court held that, in Georgia, "[t]he State is free to have the defendant arrested for the subsequent offense, to seek the revocation of bond for the original offense, or to pursue both courses simultaneously." That is, the Georgia Supreme Court recognized that arresting someone for violating a bond condition can occur prior to a hearing on bond revocation, although due process requires that a hearing be held within a reasonable time after an arrest.

> At the same time, we believe the state and federal due process clauses require at a minimum that a hearing be held within a reasonable time *after arrest* or the filing by the State of a motion to revoke bond while

information is fresh and witnesses and evidence are available.

*Id.* at 582 (emphasis supplied). Because Hood never received a hearing on his bond revocation, the Georgia Supreme Court held that, "[u]nder these facts, we find the trial court erred in failing to hold a hearing within a reasonable time after arrest." *Id.* In the present case, McLeod has no due process claim and he was released within about an hour of his arrest, negating the need for any bond revocation hearing. The point, however, is that probable cause (and at a minimum arguable probable cause) existed to believe that McLeod had violated the conditions of his Bond Order, thus providing grounds for his arrest and defeating any false arrest claim.

## II.    **McLeod's false arrest claim against Deputy Bass and Sheriff Dewey also fails because probable cause (or at a minimum arguable probable cause) existed to arrest McLeod for Disorderly Conduct in violation of O.C.G.A. § 16-11-39.**

Under the "any-crime rule" an officer is "insulate[d] from false-arrest claims so long as probable cause existed to arrest the suspect for some crime, even if it was not the crime the officer thought or said had occurred." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Applying the "any-crime rule" to qualified immunity, an officer is entitled to qualified immunity if he had arguable probable cause to arrest a suspect for any crime, even if that crime was not "'the offense announced by the officer at the time of the arrest.'" *Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir. 2002) (*quoting Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992)). Here, there existed at least arguable probable cause to support an arrest of McLeod for Disorderly Conduct.

Whether a particular set of facts gives rise to actual probable cause or "arguable probable cause" for an arrest depends on the elements of the crime. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). Relevant here is the language of O.C.G.A. § 16-11-39, which provides:

(a) A person commits the offense of disorderly conduct when such person commits any of the following:

> (1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health;

> (2) Acts in a violent or tumultuous manner toward another person whereby the property of such person is placed in danger of being damaged or destroyed;

> (3) Without provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called "fighting words"; or

> (4) Without provocation, uses obscene and vulgar or profane language in the presence of or by telephone to a person under the age of 14 years which threatens an immediate breach of the peace.

Under the established facts of this case, at least arguable probable cause existed to charge McLeod with a violation of O.C.G.A. § 16-11-39(a)(1) and (2). Deputy Bass initially responded to a complaint by county road department worker Jones that McLeod was yelling and cursing at him. *Dkt. No. 55*. When Deputy Bass arrived on scene, Jones confirmed that McLeod had been yelling and cursing at him. *Id.* Jones told Deputy Bass that this created a concern for his safety. *Id.* Unable to make contact with

McLeod, Deputy Bass left the scene. However, later that day, Deputy Bass received another complaint that McLeod was again yelling at Jones while Jones was working. *Id.* When Deputy Bass returned to the scene, he observed McLeod standing along the road a few feet from the county workers. *Id.* McLeod was taking pictures and yelling at the county workers as they were working. *Id.* This interaction, and McLeod's conduct witnessed by Deputy Bass, was consistent with the report by Jones regarding McLeod's aggressive and threatening behavior. *Id.* Deputy Bass personally witnessed McLeod behave in a aggressive and tumultuous manner toward the county workers, including Jones. *Id.* Deputy Bass believes that Jones had a reasonable fear for his physical safety based on McLeod's language, actions, and demeanor, which appeared to be intended to intimidate the workers into abandoning the public works project. *Id.* Based on these facts, arguable probable cause existed to arrest McLeod for Disorderly Conduct under O.C.G.A. § 16-11-39(a).

"As long as probable cause existed to arrest the suspect for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges." *Reid v. Henry County,* 568 F. App'x 745, 749 (11th Cir. 2014)*; accord Daniel v. Village of Royal Palm Beach*, 889 So. 2d 988, 991 (Fla. 4th DCA 2004). Thus, even if arguable probable cause did not exist to arrest McLeod for violating his bond conditions – which it did – McLeod's false arrest claim fails because his arrest was properly supported by probable cause for violating O.C.G.A. § § 16-11-39(a). As such, McLeod false arrest claim necessarily fails.

III.    **In addition to the existence of probable cause (or at a minimum arguable probable cause) justifying McLeod's arrest, McLeod's false arrest claim against Sheriff Dewey fails because he did not personally participate in McLeod's arrest or take any action that caused McLeod's arrest.**

Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (quotation marks omitted). "Section 1983 thus focuses our inquiry on whether an official's acts or omissions were the cause — not merely a contributing factor — of the constitutionally infirm condition." *Id.* Common law tort principles of damages and causation apply in the § 1983 context. *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000).

> Under traditional tort principles, causation has two required elements: cause-in-fact and legal or proximate cause. See W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, §§ 41–42, at 263–80 (5th ed.1984). A plaintiff must first show that the constitutional tort was a cause-in-fact of the injuries and damages claimed. To establish cause-in-fact, the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred. Secondly, a plaintiff must show that the constitutional tort was the legal or proximate cause of the injuries and damages claimed. An act or omission is a legal or proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission.

*Id.* at 1168, n.16. Thus, "[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Id.* at 1168. "The causal relation does not exist when the continuum between [the]

[d]efendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Dixon v. Burke*, 303 F.3d 1271, 1275 (11th Cir. 2002). A defendant's actions are not the proximate cause of a plaintiff's injury where there was an independent intervening cause. *See Troupe v. Sarasota Cty.*, 419 F.3d 1160, 1166 (11th Cir. 2005); *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 736–37 (11th Cir. 2010) (requiring "proof of an affirmative causal connection," including "personal participation" by officials in acts that result in the constitutional deprivation) (quotation omitted).

"Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action." *Dawson v. Jackson*, No. 2:16-CV-01738-RDP, 2017 WL 3620254, at *6 (N.D. Ala. Aug. 23, 2017) (finding that the plaintiff did not show that the defendant was part of the authorizing chain of command because "[w]hile [the defendant] called [the arresting officer] over and informed him that [p]laintiff was obstructing government operations, [the defendant] himself did not perform the arrest or in any way command [the arresting officer] to arrest Plaintiff"), aff'd, 748 F. App'x 298 (11th Cir. 2018).

The evidence shows that Sheriff Dewey did not personally participate in any action or conduct that led to McLeod being taken into custody by Deputy Bass on July 25, 2019. *Dkt. No. 58.* In fact, according to Sheriff Dewey, he did not even know that there was any issue with McLeod on July 25, 2019 until some point after McLeod was taken back to his home from the jail. *Id.* Sheriff Dewey did not have any role at all in

21

the decision to charge, arrest, or detain McLeod on July 25, 2019. *Id.* Sheriff Dewey did not personally participate in, know about, or direct any action that led to McLeod being taken into custody on July 25, 2019, including any action by then Deputy Bass on that day. *Id.* Nor did Sheriff Dewey personally participate in, know about, or direct any action related to any decision made not to pursue the charges and to release McLeod. *Id.*

McLeod contends that Deputy Bass told him that the Sheriff sent him out to his property on July 15, 2019: "Bass may have lied, yeah, but he said that Sheriff Dewey was the one that sent him out there." *Deposition of McLeod*, at 50:17-18; *see also id.*, at 65: 16-17. McLeod admits that he has no personal knowledge of whether this actually occurred. *Id.* at 50:15-21.McLeod also has no personal knowledge of anything specific that Sheriff Dewey said to Deputy Bass about being sent out to McLeod's house. *Id.* at 65:24-25, 66:1-4. McLeod does not have any information or evidence regarding Sheriff Dewey's knowledge of this incident, other than Deputy Bass telling him, "Mike Dewey is the one sent me out here." *Id.* at 66:12-17. However, even if it were assumed that Sheriff Dewey sent Deputy Bass to the location of the dispute with the county road department worker, McLeod's testimony makes clear that there is no evidence that Sheriff Dewey played any role in the decision to *arrest* McLeod for violating his bond conditions.  Accordingly, because McLeod fails to show an affirmative causal connection between Sheriff Dewey's actions and McLeod's arrest, his Fourth Amendment false arrest claim fails, and Sheriff Dewey is entitled to summary

22

judgment on this claim.

## Conclusion

For the reasons stated above, Defendants respectfully request that they be granted summary judgment in this action and McLeod's Amended Complaint be dismissed with prejudice.

Respectfully submitted this 6th day of February, 2024.

/s/ Brad Watkins
Bradley J. Watkins
Georgia Bar No. 740299

**ATTORNEY FOR DEFENDANTS**

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
Brunswick, Georgia 31520
Telephone: (912) 264-8544
bwatkins@brbcsw.com

CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing. In addition, a copy of this filing has been emailed to pro se Plaintiff at the following address:   jmcleod263@gmail.com

Submitted this 6th day of February, 2024.

*/s/ Brad Watkins*
Bradley J. Watkins
Georgia Bar Number: 740299

***ATTORNEY FOR DEFENDANTS***

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
Brunswick, GA 31520
(912) 264-8544